# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

BRIAN LEYLAND-JONES,

    Plaintiff,

    v.

CITY OF BRUNSWICK, GEORGIA;
CORNELL HARVEY; MARK SPAULDING;
JONATHAN WILLIAMS; ROOSEVELT
HARRIS, JR.; BRYAN THOMPSON;
LYNN FRYE; JAMES H. BROOKS,
SR.; AND DAN MCFEE,

    Defendants.

CV 214-154

## ORDER

Before the Court is Defendants' Motion for Summary Judgment. Dkt. No. 38. For the reasons below, Defendants' Motion is **GRANTED**.

## BACKGROUND

### 1. **Kennedy Funding, Inc. v. City of Brunswick**

The parties agree that the Court's Order in Kennedy Funding, Inc. v. City of Brunswick, No. 2:12cv183, 2014 WL 4829179 (S.D. Ga. Sept. 29, 2014), ECF No. 72, provides the background facts of this case.[1] See Dkt. No. 38-1, p. 2, Dkt.

---

[1] Kennedy Funding, Inc. was a lender whose $55 million dollar loan to the developer of Liberty Harbor, the property discussed herein, was not repaid.

AO 72A
(Rev. 8/82)

No. 43, pp. 1-2. The following is a recitation of facts from the Order, with adaptations where appropriate.

. . . .

The case involves alleged misrepresentations made by the City of Brunswick, Georgia ("the City") in the course of its review and approval of plats for a planned development project in Brunswick. Beginning in 2004, Gary Waxman and Jeffery Weiner assembled 130 acres of land in Brunswick to create a mixed-use real estate development called "Liberty Harbor." They did so through various corporations, such as Liberty Harbor Development, Inc., and Jered Properties, LP, collectively identified as Harbor Development, LP ("HDLP"). The development plans included a marina, dry rack boat storage, condominiums, individual homes, a retail center, and a hotel. The City worked with HDLP in reviewing HDLP's development plans, and City officials met with HDLP on various occasions to discuss the project.

The City has promulgated Subdivision Regulations. Section 400 of the Subdivision Regulations requires the Planning Commission to give final approval before a plat is recorded in the office of the Clerk of the Superior Court of Glynn County.

---

Kennedy Funding filed suit in 2012 against the City of Brunswick and the same individual defendants identified in this suit, with the exception of James H. Brooks, Sr., Member of the Commission of the City of Brunswick, and Dan McFee, the City Engineer. See Kennedy Funding, Inc. v. City of Brunswick, 2014 WL 4829179 (S.D. Ga. Sept. 29, 2014); Dkt. No. 38-1, p. 2.

Brunswick, Ga., Code app. B, art. IV, § 400. Additionally,

Section 401 requires that:

> The transfer of, sale of, agreement to sell, or
> negotiation to sell land by reference to or exhibition
> of, or other use of a plat of a subdivision that has
> not been given final approval by the Planning
> Commission and duly recorded in the office of the
> Clerk of the Superior Court of Glynn County is
> declared to be a misdemeanor and may be enjoined or
> invalidated by appropriate action. In addition, such
> illegal use of a plat is subject to the penalties for
> a misdemeanor, as provided by law, for each lot or
> parcel so transferred, sold, or agreed to be sold.
>
> The description by metes and bounds in the instrument
> of transfer, or other document used in the process of
> selling or transfer, shall not exempt the transaction
> from such penalties, as stated above.

Brunswick, Ga., Code app. B, art. IV, § 401. Therefore, Section

401 prevents subdivision lots from being sold until plats are

recorded. See id. Section 702 requires an "acceptable

performance guarantee" to be posted where improvements have not

yet been completed. Under this section:

> If all improvements as required by the Planning
> Commission in granting tentative approval of the
> preliminary plat are not properly installed and
> constructed in accordance with the required standards
> prior to the submission of a final plat application,
> the subdivider shall file with the City Manager an
> acceptable performance guarantee to insure future
> installation and construction as required.
>
> The performance guarantee must be approved by the City
> Commission and City Attorney, and must include a
> specific, reasonable and satisfactory date for the
> completion of the necessary improvements. In no case
> shall the performance guarantee be valid for more than
> two (2) years.

Brunswick, Ga., Code app. B, art. VII, § 702.  According to the Regulations, the guarantee shall be released and returned after improvements are completed and approved.  Brunswick, Ga., Code app. B, art. VII, § 702.1.  If a subdivider fails to complete the required improvements within the allotted time frame, the performance guarantee is forfeited to the City.  The language states:

> In the event the subdivider fails to install or construct the required improvements during the specific time allotted and in conformity with these regulations, the performance guarantee is forfeited to the City of Brunswick to be used for the completion of the improvements.

Brunswick, Ga., Code app. B, art. VII, § 702.2.

Section 701 of the Subdivision Regulations also makes reference to the need for the City to ensure certain infrastructure and improvements are properly installed or otherwise that an adequate guarantee has been posted to ensure the eventual installation of the required improvements.  See Brunswick, Ga., Code app. B, art. VII, § 701.

HDLP contemplated developing Liberty Harbor in phases.  The Phase I Liberty Harbor plat was filed in August 2006, and the Phase II plat was filed in October 2006.  Both plats were stamped with certifications stating that performance was guaranteed.  The Phase I certifications were dated August 3,

2006, and the Phase II certifications were dated October 16,

2006. The stamps read:

> I certify that all water system and sewer disposal
> systems have been properly installed and approved; or
> certification by the City Manager that an adequate
> performance guaranty has been posted to ensure the
> eventual installation and construction of all required
> water and sewer improvements as the standards
> required;

> I certify that all road and drainage improvements
> required by this ordinance have been properly
> installed and constructed in accordance with the
> required standards; or certification by the City
> Manager that an adequate performance guaranty has been
> posted to ensure the eventual installation and
> construction of all required road and drainage
> improvements as the standards required.

Kennedy Funding and the City disputed whether the requisite

infrastructure improvements were completed after the plats were

filed. According to Dan McFee ("McFee"), City Engineer, a

letter of substantial completion for the Phase I sanitary lift

station and sewer system was issued by the project engineer on

May 22, 2008, and the Phase I water, road, and storm drainage

systems were completed before the letter was issued. The City

issued a Certificate of Occupancy for the only residential

structure built at Liberty Harbor.[2] According to Kennedy

Funding, Inc., the Certificate of Occupancy was issued prior to

completion of the infrastructure. However, McFee affied that

all necessary infrastructure was installed and that any house

---

[2] This residential structure belongs to Brian Leyland-Jones, Plaintiff in the
instant action.

built in Phase I today would be entitled to a certificate of occupancy as well.

A manufacturing facility, Jered Industries,[3] located within Liberty Harbor, has not yet been relocated and undisputedly serves as an impediment to certain further improvements. According to McFee, the Jered facility and all other abandoned industrial buildings on the site would have to be demolished before infrastructure could be installed on the Phase II property.

A key facet of Kennedy Funding, Inc.'s suit was its belief that the City must comply with regulation Section 702 and its requirement of a performance guarantee. Defendants maintain that they did not need to comply with Section 702. Lynn Frey ("Frey"), the former City Attorney, stated that Gene Stancak, who was the developer of Liberty Harbor, contacted Frey to inquire about whether a different regulation, Section 903, applied to Liberty Harbor and could be used to work around the rule prohibiting a subdivider from selling lots until the filing of a final plat. Section 903 provides:

---

[3] Jered Industries is a manufacturer of defense and commercial marine systems that had a long-term lease on a significant portion of the platted Phase II of Liberty Harbor. Because Jered's facility was aging, Jered was amenable to relocating to a different part of Brunswick with help from HDLP and the City. According to former Brunswick Mayor Bryan Thompson, progress was made toward relocating Jered, but HDLP stopped responding to communications from Jered and the City by the middle of 2008. City representatives sent a letter to Liberty Harbor dated September 19, 2008, notifying Liberty Harbor representatives that because of the stalled progress in relocating Jered, efforts would instead be put toward obtaining funding for Jered to fulfill its lease obligations in the original location.

In the case of plans for large-scale developments, the
standards and requirements of these regulations may be
modified by the Planning Commission if the
development:

(A)   Achieves substantially the objectives of these
      regulations;

(B)   Is further protected by covenants or other legal
      provisions as will assure conformity to and
      achievement of the plan;

(C)   Contains or is bounded by major streets as
      necessary;

(D)   Contains reserved areas of sufficient size to
      serve its population for playgrounds, parks, and
      other such open space;

(E)   Is provided with public water and sewage
      facilities; and

(F)   Is situated in a PD – Planned Development Zoning
      District and developed in accordance with the
      provisions that apply to this district.

Brunswick, Ga., Code app. B, art. IX, § 903.  According to the

Preamble and Enactment Clause of the Subdivision Regulations,

the regulation exists for the following purposes:

(A)   To encourage economically sound and stable land
development;

(B)   To assure the provision of required streets,
utilities, and other facilities and services to new
land developments;

(C)   To assure the adequate provision of safe and
convenient traffic access and circulation, both
vehicular and pedestrian, in new land developments;

(D)   To assure the provision of needed public open
spaces and building sites in new land developments
through the dedication or reservation of land for

AO 72A
(Rev. 8/82)

recreational, educational and other public purposes; and

(E)  To assure that land is developed in conformity with the Comprehensive Plan for Brunswick and Glynn County, Georgia, as amended from time to time.

Brunswick, GA., Code app. B, art. I.

After Frey determined that Liberty Harbor was a planned large-scale development meeting the requirements set forth in Section 903, he advised the City Council that Section 903 allowed the Council to modify the Subdivision Regulations as long as the modifications substantially achieved the objectives of the Regulations.  He also opined that Section 903 gave the City the flexibility to forego any infrastructure certification on the plats, but the City still wanted to memorialize the fact that an infrastructure agreement existed.  Frey and the City Council shared the belief that Section 702 did not apply to Liberty Harbor.  Defendants decided to require that infrastructure be installed after the lots were sold but before any Certificate of Occupancy would be issued.  The Defendants further determined that Liberty Harbor, LLC, would provide a guarantee, although not one that required monetary backing. Kennedy Funding characterized this guarantee as a naked promise.

On March 31, 2006, Liberty Harbor, LLC wrote to Bryan Thompson, Mayor of Brunswick, stating, "Liberty Harbor, LLC, hereby guarantees that the on-site infrastructure, as detailed

on our site plans and accompanying documents, will be completed
by the time that the buildings to be constructed are ready for
occupancy." On May 16, 2006, Roosevelt Harris, Jr., former City
Manager, wrote to Liberty Harbor, LLC, noting:

> City approval of your preliminary and final plat
> submittals will be conditioned upon and subject to our
> receipt of written documentation from Liberty Harbor
> LLC supporting its guarantee set forth in your letter
> to Mayor Bryan Thompson dated March 31, 2006, that it
> will follow through in a timely manner on its design
> and construction of all of the infrastructure
> components as depicted in its graphic and narrative
> plans approved by the City in the course of the
> subdivision approval process.
>
> These necessary items shall include water, wastewater,
> stormwater/drainage and other utilities, as well as
> all street, curbing/gutter, walkway/sidewalk, parking,
> recreational/greenspace and other facilities as
> required and approved by the City. Liberty Harbor LLC
> shall submit to me, prior to final plat approval, a
> proposed schedule of activities for staff review and
> approval by the City Commission. In the event Liberty
> Harbor LLC fails to adhere to the design, approval,
> and construction schedule . . . as approved, the City
> may require Liberty Harbor LLC to provide the City
> with further assurance of completion, which may
> include a deposit in sufficient form and amount as
> shall be agreed upon by the parties. In such event the
> City will notify Liberty Harbor LLC in writing of the
> terms of additional assurances it requires.
>
> In no event will the City issue any Certificate of
> Occupancy or allow use of any residence or other
> structure within the subdivision in the absence of
> completed infrastructure.

Paul Levine, Manager of Implementations for Liberty Harbor,
LLC, signed a statement "represent[ing] and guarantee[ing] that
[Liberty Harbor LLC] will timely construct all infrastructures

as shall be approved by the City of Brunswick." After receiving this promise from Liberty Harbor, LLC, Frey notified McFee that the City "received an acceptable guarantee that infrastructure would be installed in a manner that accomplished the goals of the Subdivision Ordinance." McFee then certified on the plats that the City received an acceptable guarantee that infrastructure would be installed in a matter that satisfied the goals of the Subdivision Regulations. Although the City now contends that Section 702 does not apply, McFee stated that he stamped the plats with language similar to that in Section 702 of the Subdivision Regulations "for convenience."

## 2. **Additional Facts for this Case**

The facts set out above present a detailed backdrop for the dispute at bar. The parties assert the following additional facts.

Beginning in 2004, an Ohio-based partnership began acquiring what would eventually be a 130-acre parcel of land in Brunswick. Dkt. No. 38-2 ¶ 1. The partnership hoped to develop the property—which it named Liberty Harbor, after the liberty ships that were built there during World War II—through several of its corporations, including Liberty Harbor, LLC, and Harbor Development, LP (collectively, "HDLP"). Id. ¶ 2. Liberty Harbor was to be a high-end, mixed-use development, with single-family homes, condominiums, and hotels, as well as restaurants, shops,

AO 72A
(Rev. 8/82)

and a 450-slip deep-water marina. Id. ¶ 3. Because the Liberty

Harbor property lies entirely within the limits of the City of

Brunswick, the City was responsible for all zoning and

permitting issues associated with the development. Id. ¶ 4. In

September of 2005, Liberty Harbor, LLC submitted a rezoning

application to the City, which was subsequently granted,

changing the zoning designation of the property from mixed

industrial to PD-G, or "Planned Development - General." Id. ¶

5. The planned development text applicable to Liberty Harbor

authorized both residential and commercial uses within the

development. Id. ¶ 6. An amended rezoning application,

submitted in April 2006 and approved in May 2006, served

primarily to add the 450-slip marina to the zoning scheme; it

did not change the zoning classification of any part of Liberty

Harbor. Id. ¶ 7. In 2006, HDLP asked the City whether it would

be possible for the City to allow HDLP to commence lot sales

prior to the filing of a final plat. Id. ¶ 8. The primary

objective of Section 702 of the City of Brunswick Subdivision

Regulations is to ensure that City residents are never living

without basic utilities.[4] Id. ¶ 9. The City concluded that it

could allow faster lot sales and still adhere to the goals of

[4] In Plaintiff's Statement of Material Facts, Dkt. No. 43-1, Plaintiff's
counsel disputes this assertion, taken from the Deposition of Lynn Frey.
Id., p. 1. He states, "[T]he primary reason for ordinances such as Section
702 is to assure those who purchase homes in a new subdivision will receive
the public improvements that were a large part of the inducement to purchase
lots and/or homes in that development." Id. Plaintiff's counsel does not
support his assertion with citation to the record or any other authority.

the Regulations by conditioning the issuance of certificates of occupancy on the installation of all infrastructure serving the development phase in which the certificate was sought. Id. ¶ 10. The City obtained a written agreement from HDLP, acknowledging that no certificate of occupancy would be issued for a Liberty Harbor property until all platted infrastructure for the pertinent phase was installed. Id. ¶ 11. City Attorney Lynn Frey then wrote to City Engineer Dan McFee, informing him that a performance guarantee had been obtained. Id. ¶ 12. City Manager Roosevelt Harris, who was copied on Frey's letter to McFee, then told McFee to "go ahead and sign the plat." Id. ¶ 13. The Phase I final plat was filed in August of 2006, and the Phase II final plat was filed in October of 2006.[5] Id. ¶ 14. Each plat bears certifications from McFee that infrastructure improvements for the phase have been installed, or alternately, that the City Manager has certified that an adequate performance guarantee has been posted to ensure eventual installation of the improvements. Id. ¶ 15. From 2007 to 2008, all platted water and sewer for Phase I were installed and hooked to City mains as necessary. Id. ¶ 16. All roads, curbing, and storm drainage were also installed as platted.[6] Id.; Dkt. No. 43-1 ¶ 16. The

---

[5] Although Plaintiff does not dispute this fact, dkt. no. 43-1, p. 1, he asserts in his Response Brief that the Phase II plat was recorded November 2, 2006, dkt. no. 43, p. 1.
[6] The parties dispute whether the Georgia Department of Transportation ("GDOT") nixed the platted entrance and/or required its relocation to an area

Phase I infrastructure was deemed to be substantially complete by the project engineer in May of 2008. Dkt. No. 38-2 ¶ 18. The City has maintained the roads in Phase I as necessary since the infrastructure was completed.[7] Id. ¶ 19.

In the summer of 2007, while construction of the Phase I infrastructure was underway, Plaintiff met HDLP principal Gary Waxman on a flight from Brunswick to Atlanta. Id. ¶ 20. Waxman convinced Plaintiff that a property in Liberty Harbor would be a good long-term investment, and Plaintiff subsequently purchased two waterfront lots in the development, which he had never actually visited. Id. ¶ 21. In early 2008, Waxman told Plaintiff that construction was beginning on the first seventeen or eighteen houses in the development, and that Leyland-Jones could receive a discount on "furnishings and upgrades" if he agreed to have one of the houses constructed on his property. Id. ¶ 22; Dkt. No. 43-1 ¶ 22. Waxman told Plaintiff that HDLP would rent the house back from Plaintiff for use as a model home for two years, at a rate of $11,000 or $12,000 a month. Dkt. No. 38-2 ¶ 23. Over the next two years, Plaintiff paid $1.7 million to build a house on one of his lots, although he was "too busy" to visit the site at any point prior to, during, or

---

within Phase II. The parties agree, however, that access to the property was off of the "DNR access" road, i.e. Conservation Way. Dkt. No. 38-2 ¶ 16; Dkt. No. 43-1 ¶ 16.

[7] Plaintiff disputes this assertion but does not cite to record evidence to do so. See Dkt. No. 43-1 ¶ 19.

after construction. Id. ¶ 24. He believes now that this was a "grossly, grossly inflated price" for the structure that was built. Id. ¶ 25. A certificate of occupancy was issued to Plaintiff in 2010. Id. ¶ 26. Plaintiff relied exclusively on advice from his bank and tips from his colleagues in Atlanta in deciding to purchase the Liberty Harbor lots and build a house. Id. ¶ 27. He did not recall ever having seen the Liberty Harbor plats generally, or the guarantee language on them specifically, prior to his deposition in this case. Id. ¶ 28. Plaintiff has no knowledge as to whether anyone from his bank ever reviewed the plats or communicated with the City in any way. Id. ¶ 29. From the time that construction of the house began until mid-2011, Gary Waxman and Jeff Weiner spoke with Plaintiff "every two to three weeks," assuring him that the Liberty Harbor development was moving along as scheduled. Id. ¶ 30. In the middle of 2011, Plaintiff, who still had not physically seen the property, finally became aware that something was amiss when he learned that Waxman and Weiner had filed for bankruptcy. Id. ¶ 31; Dkt. No. 43-1 ¶ 31. An acquaintance who had purchased several condominium units in Liberty Harbor visited the site and called Plaintiff to inform him of the true condition of the development—namely, that Plaintiff's house was the only structure that had ever even been started, and that no progress on the development had occurred since the completion of the

AO 72A
(Rev. 8/82)

Phase I infrastructure three years prior. Dkt. No. 38-2 ¶ 32. Realizing that Waxman had lied to him, Plaintiff filed suit, pro se, against eight defendants, including HDLP, Waxman, Weiner, and the bank that made him the loans to buy the lots and build the house. Id. ¶ 33. In 2013, Plaintiff filed and then quickly dismissed with prejudice a second action, this time against three defendants involved in a pre-construction appraisal of the expected post-construction value of his house. Id. ¶ 34; Dkt. No. 43-1 ¶ 34. While McFee testifies that "[a]ll infrastructure platted for Phase I has been substantially completed," Dkt. No. 38-2 ¶ 36, Plaintiff contends, without citing to the record, that no road within Phase I connects to any other road in the City of Brunswick, other than those roads already located within Phase I, and that East Promenade has not been built or maintained, dkt. no. 43-1 ¶ 36.[8] The original main entrance (the road and cul-de-sac system shown in the bottom right-hand corner of the Phase I plat) was not constructed; the parties disagree whether the non-construction was at the direction of GDOT.[9] Dkt.

[8] Copies of the pertinent portion of the Phase I plat, and an aerial photograph of Liberty Harbor from Google Maps, can be found at Dkt. No. 38-2, pp. 16-17. The Phase I plat appears as Exhibit 1 to the Deposition of Dan McFee, but that copy is largely illegible.

[9] Defendants argue that GDOT's May 30, 2007 letter, dkt. no. 38-4, p. 84, instructs Liberty Harbor to use two construction access points located along Conservation Way until 90 units are constructed, at which time construction could begin on a new main entrance, relocated by GDOT to an area within Phase II. Dkt. No. 38-1, p. 9. Defendants contend "GDOT specifically rejected HDLP's request to install the main entrance further south, in Phase I." Id. Plaintiff argues that GDOT gave its permission to use an entrance within Phase I off Conversation Way, "where the two . . . large posts" are, until

No. 38-2 ¶ 37; Dkt. No. 43-1 ¶ 37.  While Defendants assert the right-of-ways for Shipyard Drive and Admiralty Way are contiguous, dkt. no. 38-2 ¶ 38, Plaintiff asserts that they are only "near each other," dkt. no. 43-1 ¶ 38, connected only by a "dirt and gravel path which is not in the right of way of either road," dkt. no. 43, p. 5.  However, Plaintiff cites for support the Affidavit of Park D. Privett, Jr., see dkt. no. 43, p. 4, dkt. no. 45, which the Court excluded from evidence because of its untimeliness, dkt. no. 56.

Jered Industries, a manufacturer of defense and commercial marine systems, has a longterm lease on its sizeable facility, which occupies a significant portion of the platted Phase II as shown in the aerial photograph.  Dkt. No. 38-2 ¶ 39.  After the Phase II plat was approved, Jered's facility became a non-conforming use, which is permitted to continue so long as the facility is not expanded and the use does not stop for a period of one year or more.  Id. ¶ 40.  In 2007 and early 2008, Harbor Development and Jered entered into negotiations to relocate Jered to a different facility so that the one in Phase II could be demolished.[10]  Id. ¶ 41.  However, by mid-2008—around the time it disengaged completely from the Liberty Harbor development—

more than 90 permits were needed and a second entrance was constructed.  See Dkt. Nos. 43, p. 5; 43-1 ¶¶ 16-17.
[10] The parties agree that, before any infrastructure could be installed on the Phase II property today, the still-functioning Jered facility and the Georgia Power substation serving it would have to be vacated and demolished.  Dkt. No. 1-1 ¶ 62; Dkt. No. 38-1, p. 11.

HDLP stopped communicating with Jered about the relocation project, prompting the head of the Brunswick/Glynn County Development Authority, the President of Jered, and Mayor Thompson to write a letter to HDLP on September 19, 2008. Id. ¶ 42. The letter noted that several months' worth of "outreach to Liberty Harbor" had proven unsuccessful and that "efforts to relocate Jered ha[d] completely stalled" as a result, and concluded that Jered had no choice but to finish out its lease in the existing facility. Id. ¶ 43. No infrastructure was ever installed in Phase II. Id. ¶ 44. The time allotted for installation of infrastructure improvements in a phase of Liberty Harbor was, "in the case of home sites, . . . 12 months after the closing on the sale of the property." Id. ¶ 45; see also id., pp. 11-12. The sale of the first lot in Phase II of Liberty Harbor to a buyer other than HDLP and its affiliates closed on January 4, 2007. Id. ¶ 46.

Defendants contend that the aerial photo, dkt. no. 38-2, p. 17, shows that Phase I of Liberty Harbor and Plaintiff's house on the left-hand side of the photo, located on Admiralty Way, are currently accessible from three different directions. Dkt. No. 38-1, p. 10.

> The bottom of the photograph shows the GDOT-approved entrances from Conservation Way. At the top left of the photograph is the entrance from Shipyard Drive, a City street, to Admiralty Way. The top boundary of the Phase I plat, which cuts across the

right-of-way for Admiralty Way, is the edge of the
right-of-way for Shipyard Drive, and the right-of-ways
for Shipyard Drive and Admiralty way are thus
contiguous. McFee Depo., 44:24-45:14. While the
platted intersection of the two streets is currently
obstructed by vegetation, the dirt and gravel road
visible on the aerial photograph is adjacent to the
platted intersection and connects the streets.
Finally, in the top right-hand quadrant of the
photograph is another dirt and gravel road that
connects a Liberty Harbor cul-de-sac to Albany Street
through the Jered Industries facility.

Id. Plaintiff, on the other hand, contends that Admiralty

Way

does not connect to the [City of Brunswick] system of
streets, that one roadway which should connect it
(East Promenade) is blocked by a Georgia Power
substation, that East Promenade was dedicated to the
public and accepted by the [City of Brunswick], that
East Promenade is a city road, that the substantial
constitutes an illegal obstruction that must be
removed, that the manufacturing facility in Phase II
blocks a second connection to the [City of Brunswick]
system of streets (Kings's Post), that King's Post has
been dedicated to the public and accepted by the [City
of Brunswick], that these obstructions constitute
continuing nuisances that must be abated, that the
City cooperated with the developer to create these
nuisances, that the City is responsible for
maintenance of [City of Brunswick] streets, that it is
responsible for their abatement, and that the City is
liable for inverse condemnation of Plaintiff's
property by reason of its failure to abate these
continuing nuisances.

Dkt. No. 43, p. 2.

Plaintiff stated in his verified Complaint: "[M]ore than

six months have elapsed since Plaintiff became aware that [the

City of Brunswick] unconstitutionally deprived him of a property

right, and . . . . Plaintiff did not provide [City of Brunswick]

with an ante litem notice as required by state law . . . ."
Dkt. No. 1-1 ¶ 187; id. p. 45. Plaintiff's only attempt at
providing ante litem notice of any of his claims was his
submission of the August 7, 2014 letter attached to his
complaint. Dkt. No. 38-2 ¶ 48; see also Dkt. No. 1-1, p. 43-44.
Indeed, Plaintiff asserts this letter provided ante litem notice
to Defendants. Dkt. No. 43, p. 6.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." FED. R. CIV.
P. 56(a). Facts are considered "material" where they "might
affect the outcome of the suit under the governing law," and
issues of material fact are considered "genuine" where "the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986). The party seeking summary judgment must
first identify grounds that show the absence of a genuine issue
of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-
24 (1986). To discharge this burden, the movant must show the
court that there is an absence of evidence to support the
nonmoving party's case. Id. at 325. The burden then shifts to
the nonmoving party, who can defeat the motion for summary
judgment by going beyond the pleadings and presenting

affirmative evidence from which a jury might return a verdict in its favor. Anderson, 477 U.S. at 257.

The court must view the evidence and draw all inferences in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970). Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012).

## DISCUSSION

In the Complaint, dkt. no. 1-1, Plaintiff asserts against Defendants claims of nuisance (Count I), interference with easement of access (Count II), inverse condemnation (Count III), breach of duty to complete road (Count IV), breach of duty to maintain road (Count V), negligent misrepresentation (Count VI), civil rights violations pursuant to § 1983 (Count VII), and breach of third-party beneficiary contract (Count VIII). In its Response to Defendants' Motion for Summary Judgment, Plaintiff concedes his negligent misrepresentation claim (Count VI). Dkt. No. 43, p. 7. Before addressing the remaining claims, the Court must first address some threshold issues.

### 1. Sovereign Immunity Defense

Defendants make a blanket assertion that the sovereign immunity defense "is applicable to each and every state-law claim in this suit" and that Plaintiff "has not met his burden to show that sovereign immunity is waived for any of his claims against the City." Dkt. No. 38-1, p. 25.

It is true, as Defendants assert, that under Georgia law the party seeking to benefit from a waiver of municipal sovereign immunity bears the burden of showing that a municipality has waived its sovereign immunity. Kennedy Funding, Inc. v. City of Brunswick, 91 F. Supp. 3d 1299, 1301 (S.D. Ga. 2015). The sovereign immunity analysis applicable to a municipality applies equally to claims against its public employees in their official capacities. Id. at 1301. Thus, a city employee, in his official capacity, is entitled to sovereign immunity whenever the city that employs him would be so entitled. Id. at 1301-02 ("Suits against public employees in their official capacities are in reality suits against the state and, therefore, involve sovereign immunity." (citing Cameron v. Lang, 549 S.E.2d 341, 346 (Ga. 2001))).

However, sovereign immunity is invoked exclusively against tort claims, not claims that are contractual in nature. CSX Transp., Inc. v. City of Garden City, 391 F. Supp. 2d 1234, 1238 (S.D. Ga. 2005) (citing Barton v. City of Rome, 610 S.E.2d 566 (Ga. Ct. App. 2005); City of Atlanta v. Atlantic Realty Co., 421 S.E.2d 113 (Ga. Ct. App. 1992) ("The doctrine of sovereign immunity is available to a municipality against claims based on negligence. The defense is not applicable to claims against a municipality which are contractual in nature.")). Additionally, Georgia recognizes an exception to sovereign immunity for

AO 72A
(Rev. 8/82)

nuisance claims. City of Thomasville v. Shank, 437 S.E.2d 306, 307 (Ga. 1993) (noting that the exception "is based on the principle that a municipal corporation can not, under the guise of performing a governmental function, create a nuisance dangerous to life and health or take or damage private property for public purpose, without just and adequate compensation being first paid"). Given the explanation by the Georgia Supreme Court for the nuisance exception, the Court is persuaded that an exception is warranted not only for Plaintiff's nuisance claim (Count I), but also for his inverse condemnation claim (Count III) and interference with easement of access claim (Count II). See Rabun Cty. v. Mountain Creek Estates, LLC, 632 S.E.2d 140, 143 (Ga. 2006) (noting limited waiver of sovereign immunity based on the takings clause of the Georgia Constitution). Additionally, because Plaintiff's breach of duty claims (Counts IV and V) appear to be based not in tort but in contract, as is the breach of third-party beneficiary contract claim (Count VIII), they also survive Defendants' sovereign immunity defense. See CSX Transp., Inc., 391 F. Supp. 2d at 1238. Therefore, sovereign immunity is not a bar to Plaintiff's claims.

## 2. Individual Liability

Plaintiff asserts claims against the City of Brunswick and eight of its officers or agents in their "official and individual capacities." See, e.g., Dkt. No. 1-1 ¶ 3. Most of

AO 72A
(Rev. 8/82)

the named Defendants—i.e. Cornell Harvey; Mark Spaulding;
Jonathan Williams; Bryan Thompson; Lynn Frye; and James H.
Brooks, Sr.—are mentioned only in the style of the case and
within the jurisdiction section of the Complaint, nowhere else.
Though Plaintiff does mention two individual Defendants,
Roosevelt Harris, Jr. and Dan McFee, in other sections of the
Complaint, dkt. no. 1-1 ¶¶ 36, 37, 59, the Complaint does not
specify which claims are asserted against these or any other
individual Defendants.  The Complaint simply asserts actions by
"City Defendants" or "COB officials and employees."  See, e.g.,
id. ¶¶ 168, 184.  The only hint as to which claims Plaintiff
attempts to assert against individual Defendants is his prayer
for relief, which asks that "Plaintiff have judgment against
City Defendants for violation of his civil rights pursuant to 42
U.S. Code § 1983."[11]  Id. ¶ 199.

Regarding any individual Defendant, the Court is doubtful
that Plaintiff's Complaint states a claim pursuant to § 1983, or
any other claim alleged in the Complaint, upon which relief can
be granted.  See FED. R. CIV. P. 12(b)(6); accord Bennett v.
Nationstar Mortgage, LLC, No. CV 15-00165-KD-C, 2015 WL 5294321,
at *1 (S.D. Ala. Sept. 8, 2015) (noting that plaintiff's
complaint should "identify with specificity the factual

---

[11] Plaintiff makes a similar prayer for relief regarding his negligent
misrepresentation claim; however, as noted above, Plaintiff has conceded that
claim.  Dkt. No. 43, p. 7.

AO 72A
(Rev. 8/82)

allegations used to support each discrete claim against each individual Defendant"). However, even assuming that he has, Plaintiff has not presented sufficient evidence regarding the alleged liability of any individual Defendant to survive a motion for summary judgment. The Court **GRANTS** summary judgment as to the individual Defendants in their individual capacities.

### 3. Ante Litem Notice and Plaintiff's Claims for Nuisance (Count I), Interference with Easement of Access (Count II), Breach of Duty to Complete Road (Count IV), and Breach of Duty to Maintain Road (Count V)

Defendants argue that Plaintiff's claims for nuisance, interference with easement of access, breach of duty to complete road, and breach of duty to maintain road are barred because Plaintiff failed to provide the City of Brunswick with proper ante litem notice. Dkt. No. 38-1, p. 23. They argue that even if the substance of Plaintiff's August 7, 2014 letter was sufficient ante litem notice, Plaintiff did not wait 30 days before filing suit against the City as required by Georgia law. Id.

O.C.G.A. § 36-33-5 states that "[n]o person . . . having a claim for money damages against any municipal corporation on account of injuries to person or property shall bring any action against the municipal corporation for such injuries, without first giving notice as provided [herein]." § 36-33-5(a) (emphasis added). It also requires that the person "having the

claim shall present the claim in writing to the governing authority of the municipal corporation for adjustment, stating the time, place, and extent of the injury . . . and the negligence which caused the injury" within "six months of the happening of the event upon which a claim against a municipal corporation is predicated." § 36-33-5(b). "The ante litem notice statute further provides that the claimant may not file its complaint until one of the following two events occurs: the city acts on the claim, or 30 days pass since presentation of the notice." Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1228 (11th Cir. 2002) (citing O.C.G.A. § 36-33-5(c); Jones v. City of Austell, 305 S.E.2d 653, 654 (Ga. Ct. App. 1983)).

There is no question Plaintiff did not wait 30 days after sending his alleged ante litem notice to file suit against the City. However, it appears the City of Brunswick responded to Plaintiff's notice via letter on August 19, 2014. Dkt. No. 44-1, p. 2. Plaintiff filed suit three days later. Dkt. No. 1-1, p. 1. Therefore, assuming Plaintiff's August 7, 2014 letter is sufficient ante litem notice, Plaintiff waited an appropriate amount of time to file suit according to the statute, as interpreted by the Georgia Courts, because the City had acted on his claim. Info. Sys. & Networks Corp., 281 F.3d at 1228.

AO 72A
(Rev. 8/82)

However, our analysis does not end there. As Defendants point out, Plaintiff "admits, in his complaint, that more than six months have elapsed since Plaintiff became aware that [City of Brunswick] unconstitutionally deprived him of a property right, and [] Plaintiff did not provide [City of Brunswick] with an ante litem notice as required by state law." Dkt. No. 46, p. 6 (citing Dkt. No. 1-1 ¶ 187). Generally, "a party is bound by the admissions in his pleadings." Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 621 (11th Cir. 1983). Accordingly, Plaintiff's admission in his verified Complaint that he had not provided ante litem notice with regard to his property claims "is binding and conclusive to establish" that he did not do so. Id. Moreover, even if the Court were not to hold Plaintiff to his verified Complaint, he has presented no competent evidence that he provided timely ante litem notice. "[O]nce the City moved for summary judgment asserting lack of ante litem notice, the burden shifted to [Plaintiff] to present evidence negating the City's assertion." Harris-Jackson v. City of Cochran, 652 S.E.2d 607, 609 (Ga. Ct. App. 2007) (finding that plaintiff's property damage claim was not sufficient ante litem notice of a personal injury claim and stating that even if it were, plaintiff's claim still failed because plaintiff presented no competent evidence that ante litem notice had been provided (emphasis added)). Here,

Plaintiff testified that he became aware the roads within Liberty Harbor were not acceptable to him "in the middle of [20]11" when a friend called Plaintiff and told him "'You are being gypped.'" Dkt. No. 38-7, p. 17. He also asserted in the Complaint that "[i]n September 2011 it became known that HDLP was incapable of completing the improvements to Phase I and Phase II of Liberty Harbor and will not do so." Dkt. No. 1-1 ¶ 118. Plaintiff thus knew or should have known of his potential claims by, at least, September 2011. His ante litem notice is, therefore, untimely under § 36-33-5. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's nuisance (Count I), interference with easement of access (Count II), breach of duty to complete road (Count IV), and breach of duty to maintain road (Count V) to the extent they seek money damages.[12] See Dkt. No. 1-1 ¶ 95 (seeking special damages for nuisance claim); id. ¶ 110 (seeking money damages for interference with easement of access claim).

### 4. Mandamus and Plaintiff's Claims for Nuisance (Count I), Interference with Easement of Access Claim (Count II), Breach of Duty to Complete Road (Count IV), and Breach of Duty to Maintain Road (Count V)

Plaintiff alleges "[t]he blocking of King's Post by the Jered Industries building constitutes a public and private nuisance which is being maintained by [City of Brunswick]," and

---

[12] It does not appear from Plaintiff's Complaint that he seeks money damages for breach of duty to complete road (Count IV) and breach of duty to maintain road (Count V) claims. Dkt. No. 1-1, pp. 26-27.

AO 72A
(Rev. 8/82)

"[t]he blocking of East Promenade by the Georgia Power Company substation constitutes a public and private nuisance which is being maintained by [City of Brunswick]." Dkt. No. 1-1, ¶¶ 93-94. Plaintiff claims the nuisance may be abated by the City "[b]ecause HDLP and [City of Brunswick] intended to relocate Jered Industries outside of Liberty Harbor and remove the Georgia Power substation." Id. ¶ 97. Finally, Plaintiff avers it is unlawful to allow obstruction of these public roads and that he is entitled to an injunction. Id. ¶¶ 95, 98-99. Plaintiff's breach of duty claims and interference with easement of access claim are similar in that they allege Plaintiff's property rights, the blocking of ingress and egress and/or lack of access to his property, and his alleged entitlement to a Writ of Mandamus. Id. ¶¶ 104, 109, 122, 124, 129.

Plaintiff testified that for these four claims he seeks the removal of Jered and Georgia Power from their facilities and the placement of new roads, among other things. Dkt. No. 38-7, p. 10:25-11:6; 14:3-8; 21:16-22:1. Citing this Court's Order in Kennedy Funding, Inc., 2014 WL 4829179 at *6, Defendants argue that the relief Plaintiff seeks is unavailable. Dkt. No. 38-1, p. 23. The Court agrees.

Under Georgia law, a writ of mandamus may issue to compel a public officer to perform a legally required duty, when a defect of justice would follow from a failure to perform or improper

performance of the duty and where there is no other legal remedy for the rights at issue. O.C.G.A. § 9-6-20. Mandamus is an extraordinary remedy that is appropriate only when the claimant has a clear legal right to the relief sought. Bland Farms, LLC v. Ga. Dep't of Agric., 637 S.E.2d 37, 39 (Ga. 2006)(quoting Schrenko v. DeKalb Cnty. Sch. Dist., 582 S.E.2d 109, 116 (Ga. 2003)). The duty that the claimant seeks to enforce must be one "arising by law, either expressly or by necessary implication; and the law must not only authorize the act to be done, but must require its performance." Id. (quoting Gilmer Cnty. v. City of East Ellijay, 533 S.E.2d 715, 717 (Ga. 2000)).

Mandamus is a prospective remedy. Ianicelli v. McNeely, 527 S.E.2d 189, 191 (Ga. 2000). It is not available "to compel the undoing of acts already done or the correction of wrongs already perpetrated." Coastal Serv., Inc. v. Jackson, 154 S.E.2d 365, 366 (Ga. 1967) (quoting Wilson v. Sanders, 151 S.E.2d 703, 705 (Ga. 1966)). Though mandamus may issue to compel the performance of specific duties,

> it will not lie to compel a general course of conduct or the performance of continuous duties nor will it lie where the court issuing the writ would have to undertake to oversee and control the general course of official conduct of the party to whom the writ is directed.

Speedway Grading Corp. v. Barrow Cnty. Bd. Of Comm'rs, 373 S.E.2d 205, 207 (Ga. 1988) (quoting Solomon v. Brown, 128 S.E.2d

AO 72A
(Rev. 8/82)

735, 736 (Ga. 1962)). Mandamus will not be granted where it would, for any reason, be nugatory or fruitless. O.C.G.A. § 9-6-26.

As stated above, Plaintiff seeks an order of mandamus to compel the City of Brunswick to install and maintain roads and to remove the Jered building and Georgia Power substation. Dkt. No. 38-7, p. 10:25-11:6; 14:3-8; 21:16-22:1. The Court finds awarding this type of relief would compel the performance of continuous duties which the Court would have to oversee and control. Therefore, mandamus cannot lie under these circumstances. Speedway Grading Corp., 373 S.E.2d at 207. Moreover, Plaintiff has not shown that the relief he requests is even possible. Not only would it be incredibly expensive, as Jered and Georgia Power would have to be vacated and demolished, dkt. nos. 1-1 ¶ 62, 38-1, p. 11, Jered and Georgia Power occupy their properties pursuant to valid leases, and Plaintiff has not shown that the City of Brunswick has any power to terminate them.[13] See Dkt. No. 38-2 ¶ 39, Dkt. No. 38-5, p. 59:2-22; Dkt. No. 38-6, p. 9:2-7, 43:12-19, 44:5-45:25. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's claims for nuisance (Count I), Interference with Easement of Access Claim (Count II), Breach of Duty to Complete

---

[13] Upon Liberty Harbor's Phase II plat approval, both the Jered facility and the Georgia Power substation became non-conforming uses, which are permitted to continue so long as the facilities are not expanded and the uses do not stop for a period of one year or more. Dkt. No. 38-3, 22:19-23:8.

AO 72A
(Rev. 8/82)

Road (Count IV), and Breach of Duty to Maintain Road (Count V) to the extent they seek mandamus relief.

### 5. Inverse Condemnation Claim (Count III)

Plaintiff alleges that, "[a]s an owner in the Liberty Harbor subdivision, Plaintiff owns an easement in the roadways in that subdivision." Dkt. No. 1-1 ¶ 112. Plaintiff further alleges that the City "has unlawfully interfered with Plaintiff's vested property interest and enjoyment" in two roads within the subdivision, King's Post and East Promenade, and that such interference "constitutes a taking and inverse condemnation." Id. ¶¶ 113, 114. Plaintiff states that he is "entitled to a judgment to compensate him." Id. ¶ 116.

To establish an inverse condemnation claim, Plaintiff must show that the City "took some affirmative action for public purposes causing a nuisance or trespass which, in turn, resulted in the diminished utility and functionality of a private owner's land. The diminished functionality and utility, in turn, interfered with the owner's use and enjoyment of the land. Therefore, a 'taking' for public purpose occurred which support[s] a claim for inverse condemnation." Rabun Cty., 632 S.E.2d at 143.

Defendants argue that this claim, like the claims discussed in § 3, supra, is barred because Plaintiff admitted to not submitting a timely ante litem notice. Dkt. No. 38-1, p. 21.

AO 72A
(Rev. 8/82)

For the same reasons discussed above, the Court agrees. That is, even if the Court were to not hold Plaintiff to his verified Complaint wherein he asserted he had not filed timely ante litem notice, he has presented no competent evidence that he has provided timely notice. Harris-Jackson, 652 S.E.2d at 609. In fact, Plaintiff testified that he knew the roads would not be completed in mid-2011. Dkt. No. 38-7, p. 17:4-7 (In response to counsel's question, "When did you become aware that there wasn't the kind of road you wanted to get to your house?" Plaintiff testified, "Literally in the middle of '11."); id., p. 7:12-20. ("It became clear later in 2011 that [the development of Liberty Harbor] was not going to go forward."). Further, Plaintiff has produced no evidence showing that the City took an affirmative action to create the interference he alleges. See Rabun Cnty., 632 S.E.2d at 143. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's inverse condemnation claim (Count III).

### 6. § 1983 Civil Rights Violation Claim (Count VII)

The Complaint asserts, among other things, that Defendants interpreted and implemented Brunswick Codes without legal authority and failed to comply with existing codes, thereby causing Plaintiff to suffer property loss totaling $2,645,900 in violation of § 1983. See Dkt. No. 1-1, ¶¶ 142, 168. Defendants

argue, among other things, that Plaintiff's § 1983 claim is not timely. Dkt. No. 38-1, p. 18.

"[Section] 1983 merely provides a mechanism for enforcing individual rights secured elsewhere, i.e., rights independently secured by the Constitution and laws of the United States." Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002) (quotation marks omitted). "One cannot go into court and claim 'a violation of § 1983,' for § 1983 by itself does not protect anyone against anything, but simply provides a remedy." Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 601 (1979).

Interpreting Plaintiff's § 1983 claim as a taking claim, Defendants argue that the appropriate statute of limitations for Plaintiff's § 1983 claim is two years, the statute of limitations for a personal injury action in Georgia. Dkt. No. 38-1, p. 18. Plaintiff does not dispute the statute of limitations. See Dkt. No. 43, p. 12-13. Instead, Plaintiff disputes that his claim is untimely because "[t]he state cause of action that provides the closest analogy to the 1983 claims is the tort of continuing nuisance," and "the accrual of that action occurred every day that the nuisance was not abated." Dkt. No. 43, p. 13.

"[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law." Wallace v. Kato, 549 U.S. 384, 388 (2007). "Under

those principles, it is the standard rule that accrual occurs
when the plaintiff has a complete and present cause of action,
that is, when the plaintiff can file suit and obtain relief."
Id. (quotation marks and citations omitted). In other words, the
time of accrual is when plaintiff knows or has reason to know of
the injury which is the basis of the action. Mullinax v.
McElhenney, 817 F.2d 711, 716 (11th Cir. 1987). "Under federal
law, taking claims do not mature or ripen until planning
authorities and state review entities have made a final
determination on the status of the subject property." Corn v.
City of Lauderdale Lakes, 904 F.2d 585, 588 (11th Cir. 1990)
(quotation marks omitted).

Here, Defendants argue that "[a]ll of the actions taken by
the City were completed and documented in public records in
2006; the failure of the development was obvious to anyone who
actually visited it by 2008; and Leyland-Jones himself realized
that the development had failed, that his property was
'worthless,' and that he was 'basically bankrupt . . . because
of [Liberty Harbor]' by the middle of 2011." Dkt. No. 38-1, p.
18 (citing Leyland-Jones Depo., Dkt. No. 38-7, pp. 14:22, 52:9-
22); see also Dkt. No. 1-1 ¶ 118 ("In September 2011 it became
known that HDLP was incapable of completing the improvements to
Phase I and Phase II of Liberty Harbor and will not do so.").
Plaintiff argues that the "first date on which [he] would have

been aware" that the City of Brunswick would not "finish the dedicated streets" was the date Kennedy Funding sued the City "on November 14, 2012." Dkt. No 43, p. 13. Plaintiff also states he did not have a "complete and present cause of action" until August 19, 2014 when the City "denied its liability" to finish the streets. Id., pp. 13-14.

Plaintiff's argument must fail. First, Plaintiff does not plead nuisance in relation to his § 1983 claim. Instead, Plaintiff's § 1983 claim asserts that decisions and actions by the City and its agents, acting under color of state law, to circumvent certain City codes, plus Plaintiff's reliance upon Defendants' representation that they had performed their duties within certain parameters, resulted in financial harm to Plaintiff. See Dkt. No. 1-1 ¶¶ 141-187. For example, the Complaint alleges that "in making the decision not to require the posting of a performance guarantee City Defendants created four new policies . . . [which were] adopted without being reduced to writing and without any notice to the public, or hearing." Id. ¶¶ 141-165, 172-186.

Second, even if we accept Plaintiff's argument that his § 1983 claim subsumes his nuisance claim, Plaintiff offers no legal authority to support his theory that his allegations against the City constitute a viable claim for continuing nuisance. Indeed, Plaintiff has produced no evidence that the

AO 72A
(Rev. 8/82)

extent of any "nuisance" he alleges has increased or even changed since he purchased the property, as would be required to extend the statute of limitations as Plaintiff seeks in order to make his claim actionable. Provident Mut. Life Ins. Co. of Philadelphia v. City of Atlanta, 938 F. Supp. 829, 835 (N.D. Ga. 1995) (citing Duffield v. DeKalb Cty., 249 S.E.2d 235, 238 (Ga. 1978)). Nor has Plaintiff cited any authority for his contention that he did not have a "complete and present cause of action" until August 19, 2014. He has made countless statements, under oath, to the contrary. For example, "It became clear later in 2011 that [the development of Liberty Harbor] was not going to go forward." Dkt. No. 38-7, p. 7:12-20. Finally, Plaintiff's argument that his awareness of his cause of action is somehow tied to the filing of Kennedy Funding, Inc. is not only dubious but contradicts the undisputed evidence in the case. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment with regarding to Plaintiff's § 1983 claim (Count VII).

### 7. Breach of Third-Party Beneficiary Contract Claim

Plaintiff alleges in the Complaint that the City of Brunswick's "agreement with HDLP that HDLP would complete Liberty Harbor development improvements in return for obtaining approval of the proposed plat for Liberty Harbor development constitutes a contract between those parties." Dkt. No. 1-1 ¶

189. This "agreement" appears in two letters between Liberty Harbor and the City. The first letter, dated March 31, 2006, from HDLP to the then-City Mayor states, in its entirety:

> In order for certificate of occupancy applications to be submitted in a timely manner, Liberty Harbor, LLC, hereby guarantees that the on-site infrastructure, as detailed on our site plans and accompanying documents, will be completed by the time that the buildings to be constructed are ready for occupancy. Specifically, in the case of home sites, this means that the infrastructure will be completed within 12 months after closing on the sale of the property.

Dkt. No. 38-7, p. 77. The former-City Manager responds on May 16, 2006:

> Given that a major component of our subdivision approval process is to require that developers adequately provide for on-site infrastructure . . . for the benefit and welfare of your prospective purchasers and the public at large, City approval of your preliminary and final plat submittals will be conditioned upon and subject to our receipt of written documentation from [HDLP] supporting its guarantee set forth in your letter to Mayor Bryan Thompson dated March 31, 2006, that it will follow through in a timely manner on its design and construction of all of the infrastructure components as depicted in its graphic and narrative plans approved by the City in the course of the subdivision approval process.

> These necessary items shall include all water, [drainage, utilities, streets, etc.] as required and approved by the City. [HDLP] shall submit to me, prior to final plat approval, a proposed schedule of activities for staff review and approval by the City Commission. In the event [HDLP] fails to adhere to the design, approval, and construction schedule . . . the City may require [HDLP] to provide the City with further assurance of completion, which may include a deposit in sufficient form and amount . . . . In such

AO 72A
(Rev. 8/82)

event the City will notify [HDLP] in writing of the
terms of additional assurances it requires.

In no event will the City issue any Certificate
of Occupancy or allow use of any residence or other
structure within the subdivision in the absence of
completed infrastructure. . . .

Dkt. No. 38-7, pp. 74-75.  The May 16, 2006 letter was

signed by HDLP representative Paul Levine on May 26, 2006.

Id., p. 76.  The Complaint asserts the agreements made

within those letters constitute a contract, to which

Plaintiff alleges he is a third-party beneficiary.  Dkt.

No. 1-1 ¶¶ 189-192. Plaintiff asserts that, pursuant to

Brunswick Code § 702—which Plaintiff apparently asserts is

a contract in and of itself—the City "is required to use

whatever guarantee it obtained from HDLP (in this case the

bare promise to complete the improvements contained in the

letter dated May 16, 2006) to complete the improvements in

the Liberty Harbor Development."  Id. ¶¶ 190, 194.

Finally, Plaintiff claims that the City breached "its

contract with HDLP when it failed to complete the

improvements shown on Phase I and Phase II" following the

bankruptcies of HDLP representatives Waxman and Weiner.

Id. ¶ 196.

Plaintiff's claim fails.  First, it is not clear that

the letters constitute a contract between the City and

HDLP.  Indeed, in his verified Complaint, Plaintiff

characterizes the "promise" made by HDLP as a "bare" one. Id. ¶ 194. Bare promises do not a contract make. See, e.g., Newell Recycling of Atlanta, Inc. v. Jordan Jones & Goulding, Inc., 731 S.E.2d 361, 364 (Ga. Ct. App. 2012) ("It is fundamental contract law that consideration is essential to a contract which the law will enforce."). However, even if the Court were to assume that the letters between the City and HDLP satisfy the requisites of an enforceable contract, Plaintiff's claim still fails. The City's obligations under the agreement were to approve the Liberty Harbor plats and issue certificates of occupancy for only those buildings whose corresponding infrastructure was installed. See Dkt. No. 38-7, pp. 74-77. However, Plaintiff's Complaint alleges the City's breach not of those obligations, but of its "obligation," apparently under Brunswick Code § 702, to "complete the improvements." ¶ 194. As Defendants note, after peeling away the layers of Plaintiff's third-party beneficiary/breach of contract claim, all that remains is essentially a claim that the City "failed to abide by its own subdivision regulations." Dkt. No. 46, p. 5. Unfortunately for Plaintiff, his admissions in this case defeat his claim. First, he failed to properly dispute Defendants' statement that the "primary objective of Section 702 of the City of Brunswick

AO 72A
(Rev. 8/82)

Subdivision Regulations is to ensure that City residents are never living without basic utilities." See supra n.4. Plaintiff also failed to properly dispute that "all platted water and sewer for Phase I were installed and hooked to City mains as necessary," dkt. no. 38-2 ¶ 16; dkt. no. 43-1 ¶ 16, and that the City has maintained the roads in Phase I as necessary since the infrastructure was completed, see supra n.7. In fact, the evidence Plaintiff presented to support his allegations regarding the condition of the infrastructure within Liberty Harbor was contained in the Affidavit of Park D. Privett, Jr., see dkt. no. 43, p. 4, dkt. no. 45, which the Court excluded from evidence because of its untimeliness, dkt. no. 56.

Accordingly, because Plaintiff has wholly failed to show the City breached a contract as alleged in the Complaint, the Court **GRANTS** Defendants' Motion for Summary Judgment on this claim (Count VIII).

### CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, dkt. no. 38, is **GRANTED**.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 31ST day of March, 2016.


_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA